**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

New York Metropolitan Regional Center,
L.P. II,

                *Plaintiff*,

vs.

Mammoet USA Holding, Inc.,

                *Defendant*.

**<u>Complaint for Breach of Contract</u>**

## Table of Contents

Introduction ........................................................................................................... 1

The Parties ............................................................................................................. 4

Jurisdiction and Venue ........................................................................................... 5

Statement of Facts .................................................................................................. 6

    A.    The Design Build Team (DBT) breached the Design Build Agreement. .............. 6

        1.    The Agreement was a fixed-price contract.  If the DBT's costs exceeded the fixed price, it had to complete the Wheel at a loss. .............. 6

        2.    The Agreement required a specific payment process to protect NY Wheel and its lenders from the DBT's cost overruns and overcharges. ................................................................................................ 7

        3.    When the DBT's costs greatly exceeded the fixed price, it stopped complying with the payment process to manufacture an excuse to breach. .................................................................................................... 13

        4.    Finally, to stop its losses, the DBT walked off the job. ........................... 19

        5.    The DBT's material breaches. ................................................................. 21

    B.    Mammoet USA Holding and Starneth BV breached the Completion Guaranty held by lender NY Regional Center. ................................................... 23

        1.    To protect its loan, NY Regional Center secured a Completion Guaranty from Mammoet USA Holding and Starneth BV ...................... 24

        2.    After the DBT breached the Agreement, the Guarantors refused to complete the Wheel or pay damages. ....................................................... 25

        3.    NY Regional Center is entitled to damages under the Guaranty. ............. 25

Claims 26

    Count 1: Breach of contract ................................................................................. 26

Requested Relief ..................................................................................................... 26

**Introduction**

1.      The "New York Wheel" (or "Wheel") was to be the largest observation wheel in the Western Hemisphere and the centerpiece of New York City's economic revitalization plan for the Staten Island waterfront.  Each pod of the Wheel would be designed to hold 40 people, and each rotation of the Wheel would transport up to 1,440 people.



*Artist's rendering of the New York Wheel*

2.      Plaintiff New York Metropolitan Regional Center, L.P. II ("NY Regional Center") was the project lender for developer New York Wheel Owner LLC ("NY Wheel" or "Developer").  The companies responsible for building the Wheel included Mammoet Holding B.V. ("Mammoet BV"), a Dutch heavy-construction company, Starneth B.V. ("Starneth BV"), a Dutch design company specializing in giant wheels, and related Mammoet and Starneth subsidiaries, including Mammoet-Starneth LLC (the "Design Build Team" or "DBT")

1

(collectively, the "DBT Entities").  Defendant Mammoet USA Holding, Inc. (now known as

Mammoet Americas Holding, Inc.) ("Mammoet USA Holding") is one of two Guarantors (along

with Starneth B.V.) that signed a Completion Guaranty for the benefit of NY Regional Center.

3.      The DBT Entities agreed to a fixed-price contract to design and build the Wheel.

Under the contract, Developer agreed to build the Wheel foundation pad, terminal, and parking

structure.  The DBT Entities agreed to build the Wheel itself for a fixed price (initially $145

million and later increased to $165 million).  This meant that the DBT Entities would profit if

they could complete the Wheel for less than the fixed price, but that they assumed the risk that

costs would exceed the agreed-upon price.  If this happened, they would have to complete the

Wheel at a loss.

4.      NY Wheel did its job.  It built the foundation pad, terminal, parking structure, and

other supporting facilities.  It paid the DBT Entities nearly $70 million dollars for the work that

they actually completed for the Wheel.

5.      The DBT Entities, however, did not honor the contract.  Due to their lack of

diligence, they vastly underestimated how much it would cost them to build the Wheel.  The

DBT Entities eventually concluded that if they honored the contract, they would lose too much

money.  And so they tried to change the contract or escape it.

6.      The DBT Entities twice misrepresented their progress on key engineering

drawings to induce Developer to agree to increase the fixed price by $20 million.  When the

DBT Entities' costs still greatly exceeded the fixed price, they concluded that they needed to get

out of the contract.  To manufacture an excuse, the DBT Entities did not comply with the

contractual payment process and submitted false and inflated invoices.  When Developer insisted

that the payment terms of the contract be followed, the DBT Entities stopped work.

2

7.      Together, NY Wheel and lender NY Regional Center invested over $400 million trying to complete the Wheel.  Now, due to the DBT Entities' intentional breaches, there is no Wheel.  There is just a foundation, pedestals, a terminal, and a parking garage, all on an otherwise empty lot.



*The foundation, pedestals, terminal and garage built by Developer (June 2019)*

8.      The contract to build the Wheel was called the "Design Build Agreement" (the "DBA").  Ex. 1 (DBA with amendments integrated).  To sign the DBA, the DBT Entities created an entity called Mammoet-Starneth LLC (referred to as the "Design Build Team" in the agreement, or "DBT").  In reality, the DBT was not an independent company; it was a shell, fully controlled by Mammoet BV and Starneth BV.  Mammoet BV and Starneth BV executives made all of its decisions.  The DBT had no assets or employees of its own.  Soon after NY Wheel filed suit against the DBT in 2017 (*New York Wheel Owner LLC v. Mammoet-Starneth LLC*, case 1:17-cv-04026-JMF (S.D.N.Y.)), the DBT declared bankruptcy.

9.      NY Wheel will therefore need to hold the Mammoet and Starneth parent companies that were actually in control responsible. [1]

10.      In this case, lender NY Regional Center seeks to enforce a Completion Guaranty—a guaranty to complete the Wheel or pay damages—made by DBT parent companies Mammoet USA Holding and Starneth B.V.  Ex. 2 ("Guaranty"). [2]

### The Parties

11.      Plaintiff New York Metropolitan Regional Center, L.P. II is an investment partnership and lender to NY Wheel.  The General Partner of NY Regional Center is CanAm NY GP II, LLC, a Delaware limited liability company whose sole member is a citizen of New York. The limited partners of NY Regional Center are individual foreign citizens.

12.      NY Regional Center asserts a claim for breach of a Completion Guaranty provided by Mammoet USA Holding, Inc. and Starneth B.V.  That claim arises from the breach of the Design Build Agreement by the DBT and the DBT's failure to complete the Wheel project.

13.      Defendant Mammoet USA Holding, Inc. (now known as Mammoet Americas Holding, Inc.) ("Mammoet USA Holding") is an intermediate Mammoet parent that signed a Completion Guaranty for the benefit of lender NY Regional Center.  Mammoet USA Holding was a Delaware corporation with its principal offices in Rosharon, Texas.  Sometime after 2017,

---

[1] Due to a lack of subject matter jurisdiction, however, New York Wheel's claims cannot at this time be asserted in this Court.

[2] Starneth B.V. (now known, apparently, as SNEXDXB B.V) is in bankruptcy. Accordingly, NY Regional does not currently assert its claims against Starneth B.V., and it need not do so since Mammoet USA Holding, Inc. is jointly and severally liable to NY Regional.  Ex. 2, § 1.1; *Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co*., 312 F.3d 82, 87 (2d Cir. 2002) ("We have held that Rule 19 does not mandate the joinder of joint obligors.")

Mammoet USA Holding, Inc. merged into Mammoet Americas Holding, Inc.  Mammoet Americas Holding, Inc. is a Texas corporation with its principal offices in Rosharon, Texas.

### Jurisdiction and Venue

**A.    Jurisdiction**

Subject matter jurisdiction

14.     This Court has subject matter jurisdiction over this action because this is an action between "citizens of different states" (New York and Texas), "in which citizens or subjects of a foreign state" (NY Regional's limited partners) "are additional parties," and the amount in controversy is in excess of $75,000.  28 U.S.C. § 1332(a)(3).  Alternatively, this Court has subject matter jurisdiction because this is an action between (a) "citizens of different states" (New York and Texas), 28 U.S.C. § 1332(a)(1), and (b) "citizens of a State" (Texas) and "citizens…of a foreign state" (NY Regional's limited partners), provided that the green card status of the limited partners residing in Texas is not imputed to NY Regional. [3]  28 U.S.C. § 1332(a)(2).

Personal jurisdiction

15.     This Court has personal jurisdiction over Mammoet USA Holding pursuant to CPLR 301 and Fed. R. Civ. P. 4(k) because it conducts business throughout the United States, including in Manhattan and the State of New York with respect to the Wheel project.

16.     This Court has specific jurisdiction over Mammoet USA Holding pursuant to CPLR 302(a)(1) because it has transacted business within the state of New York and supplied

---

[3] Each of NY Regional's limited partners is a foreign citizen and not a citizen of any state.  Although certain of the foreign limited partners are green card holders domiciled in Texas, the partnership itself is not "lawfully admitted for permanent residence in the United States and [] domiciled in [Texas]."  28 U.S.C. § 1332(a)(2).

goods and services in the State, including by entering into the Completion Guaranty. Mammoet USA Holding also consented to the jurisdiction of the Southern District of New York, in the Completion Guaranty.

### B. Venue

17. Venue is proper because the parties to the Completion Guaranty consented to venue in the Southern District of New York. Ex. 2 (Guaranty) at 20-21 (Article XIX, agreeing to DBA § 19.2.6); Ex. 1 (DBA) at 90 (§ 19.2.6: "The venue in any action shall be the United States District Court for the Southern District of New York ("SDNY"), wherein exclusive jurisdiction and venue shall lie.").

18. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims discussed herein occurred in this judicial district.

### Statement of Facts

#### A. The Design Build Team (DBT) breached the Design Build Agreement.

##### 1. The Agreement was a fixed-price contract. If the DBT's costs exceeded the fixed price, it had to complete the Wheel at a loss.

19. On March 5, 2014, NY Wheel and Mammoet-Starneth LLC entered into the Design Build Agreement (the "Agreement" or "DBA"), pursuant to which Mammoet-Starneth LLC agreed to design and build the Wheel for a fixed price. In the Agreement, Mammoet-Starneth LLC was the "Design Build Team" and NY Wheel was "Developer."

20. Under the Agreement, the Design Build Team ("DBT") was solely responsible for all aspects of the Wheel design, engineering, procurement, fabrication, and construction, including the management of all subcontracts for the Wheel components and all erection activities. The DBT's primary responsibilities were to:

> design and build the Project and to perform, and cause to be performed or provided through Contractors . . . all design, engineering, labor, material, equipment, tools, temporary utilities, supervision and management services required for the timely, lien-free, completion of the Project . . . in accordance with the Design Build Documents . . . in consideration of the Contract Sum.

DBA at page 1.

21.     The DBT was responsible for "complet[ing] the design of the Wheel and prepar[ing] Construction Documents consistent with the Project Criteria."  DBA § 1.2.

22.     Developer's primary responsibilities under the Agreement were "the design and construction of the Pad, Terminal Building and the Balance of the Development," e.g., parking facilities and other amenities at the site.  DBA § 1.2.  Developer was also responsible for paying the DBT for the work it completed.  Payments followed a specific payment process that is described below.

23.     The parties originally agreed to a "lump sum, fixed-price" Contract Sum of $145 million for a "fully and completely constructed Project."  DBA § 6.1.  The fixed price could only be increased in limited circumstances, for example, if there were genuine changes in the scope of the work approved by Developer.  DBA § 7.1 and § 9.2.1.

24.     Importantly, the fixed price could not be increased merely because the DBT underestimated its own costs and was losing money on the deal.  That was the point of the fixed-price contract structure—i.e. to prevent cost overruns.

**2.     The Agreement required a specific payment process to protect NY Wheel and its lenders from the DBT's cost overruns and overcharges.**

25.     To protect Developer and its lenders from overcharges by the DBT, the Agreement included a specific payment process.  We first explain the contractual payment process.  We then explain how the DBT abused it, to manufacture an excuse to breach.

<u>Progress Payments and the Schedule of Values</u>.

7

26.     For the fabrication and construction of the Wheel, the DBT was paid with monthly "Progress Payments."

27.     Progress Payments depended on a Schedule of Values, a list of dollar values allocated to portions of the fabrication and construction work for the Wheel.  An initial Schedule of Values was attached as Exhibit K to the Design Build Agreement and a revised Schedule of Values was attached to certain amendments to the Agreement.  The total amount in the Schedule of Values added up to the Contract Sum (i.e. the fixed price).  To illustrate, below is an abbreviated version of the initial Schedule of Values (for the initial $145 million Contract Sum):

| Description | Amount |
|---|---|
| **A.   Wheel Structure** | **$79,793,820** |
| 1.   Fabrication of Steel Structure | |
| 2.   Erection of Steel Structure | |
| 3.   Cable Work | |
| 4.   Electrical Work | |
| **B.   Capsules** | **$24,336,180** |
| 1.   Frame work (Steel work / Polyester parts) | |
| 2.   Mechanical & Control | |
| 3.   Capsule interior (Ceiling, Floor, Glass, Door, Bench) | |
| 4.   Packing and Transportation | |
| **C.   Drive & Control System** | **$11,600,000** |
| 1.   Drive & control system | |
| 2.   Restraint system | |
| 3.   Driving system supporting tower | |
| **D.   LED** | **$7,120,000** |
| 1.   Rim, Capsule, Spoke LED | |
| **E.   Plinth** | **$970,000** |
| **F.   O&M Manual** | **$500,000** |
| **G.   Test & Commissioning** | **$1,500,000** |
| **H.   Design & Engineering** | **$11,680,000** |
| **I.   Health & Safety** | **$1,000,000** |
| **J.   Project Management** | **$6,500,000** |
| **Wheel Total** | **$145,000,000** |

DBA, Ex. K.

28.     The DBT was required to bill for Progress Payments by documenting its percentage completion for the line items on the Schedule of Values.  Percentage of completion meant the actual completion of an item (e.g., the fabrication of the Wheel capsules).  The percentage of completion was then multiplied by the value for that item in the Schedule of Values.  As a hypothetical example, if the Capsules were 50% complete, 50% would be multiplied by the value for that item ($24,336,180), resulting in a value of $12,168,90.  The Progress Payment was then calculated by subtracting out previous payments, withholding for a "Performance Payment" to be paid out only on substantial completion of the Wheel, and other retainages.  See DBA § 10.7.  When the Wheel was complete, 100% of the Schedule of Values (the fixed price) would have been paid out.

29.     Critically, the DBT could not bill for more progress than it had actually made, nor was it permitted to bill against a higher value than the value allocated in the Schedule of Values.  As a hypothetical example, if the DBT completed only 20% of a specific line item, like the Capsules, it could not bill for 50% completion.  And if the Schedule of Values for that line item was $24,336,180, the DBT could only apply the actual completion percentage (20%) to the actual Schedule of Values.  It could not bill for 20% of some higher value (e.g., $30 million) simply because the DBT expected that its costs would ultimately exceed the Schedule of Values.

30.     The Agreement required the DBT to submit to Developer "an initial schedule of values," which "shall be used as a basis for reviewing the DBT's Applications for Payment," and provided that "[t]he schedule of values shall be updated [by the DBT] in accordance with this Article."  DBA § 10.1.  The Schedule of Values could not be adjusted except through specific mechanisms set forth in the Agreement, specifically, Change Orders, which may be initiated by either Developer or the DBT and must be approved by the Developer.  DBA § 9.2.1.

31.     Fixed-priced contracts that rely on a Schedule of Values and Progress Payments are standard in the industry.  This process protects developers and project lenders from paying for more work than has actually been completed.  This process is also specifically designed to help companies like the DBT manage costs and responsibly enter into subcontracts so that out-of-pocket expenses do not exceed the amounts listed on the Schedule of Values.

Applications for Payment (AFPs)

32.     The DBT was required to submit to Developer monthly Applications for Payment (AFPs), calculating the Progress Payment due by taking "that portion of the Base Contract Sum properly allocable to completed work as determined by multiplying the percentage completion of each portion of the work by the share of the Base Contract Sum allocated to that portion of the work in the most recent Schedule of Values."  DBA § 10.7.1.

33.     Developer and the DBT agreed to use the American Institute of Architects' ("AIA") forms G-702 and G-703 for the AFP process.  DBA § 10.1.1.  These are industry standard forms that require every line item to be tied to the Schedule of Values or an approved Change Order if a payment is to be made.  They further require the DBT to certify the amounts claimed, and that "to the best of the DBT's knowledge, information and belief the Services covered by this Application for Payment ha[ve] been completed in accordance with the Contract Documents, that all amounts have been paid by the DBT for Services which previous Applications for Payment were issued and payment received from the Owner, and that current payment shown herein is now due."  DBA, Ex. L.

Excerpt from DBA, Ex. L (AIA G-702) (blue annotations added).

34.     The forms also required Developer's Consultant, a company called Arup, to certify that the amounts claimed were based on accurate measures of the percentage completion of the Work: "In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Owner's Consultant's knowledge, information and belief the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED."  DBA, Ex. L.   The amount requested by the DBT became "not negotiable" (i.e., payable) only upon mutual certification of the amount requested in that Application for Payment.  *Id.*

35.     The Design Build Agreement included a reconciliation process to protect Developer from the DBT's overstatements of progress and liability for costs in excess of the agreed Base Contract Sum.  DBA § 10.1.1 and § 10.2.

36.     The reconciliation process began with the DBT submitting an initial "pencil-copy" AFP that was "based upon the most recent Schedule of Values reasonably approved by Developer, setting forth in detail operations completed and measured against the current

Schedule of Values," and a projection for the costs to be incurred through the end of the monthly period.  DBA § 10.2.

37.     After receiving the pencil copy and corresponding backup documentation, including the invoices and information demonstrating the DBT's progress for each line item, Developer was required to review and evaluate the pencil copy, provide comments, and identify any disputed or unsubstantiated amounts.  DBA § 10.2.  To achieve this, both Developer and its consultant Arup independently reviewed the pencil copy.  Arup made site visits to various subcontractors to verify whether or not the DBT's claimed percentage completion comported with the actual work performed.

38.     Next, after the DBT's pencil copy was submitted and fully reviewed by Developer and Arup, Developer would provide comments to the DBT.  At this point, the DBT could (a) finalize and certify the Application or (b) if it disputed Developer's comments, provide additional documentation or information, and the process could be repeated in order to ensure that all proven amounts became payable.  DBA § 10.1.1 and § 10.2.

39.     The finalized AFPs included only those charges that remained undisputed at the end of this reconciliation process, and, in any case, were properly certified on the AIA Form G-702.

40.     Developer then issued a Certificate of Payment to the DBT and wired the DBT the agreed upon amount.

41.     Even after the DBT submitted a final AFP, Developer could still "withhold payment . . . to the extent reasonably necessary to protect Developer because the Work has not reached the stage indicated in the Application for Payment, or because subsequently discovered evidence may nullify in whole or in part an Application previously approved."  DBA § 10.7.10.

Amounts that remained in dispute could be "properly requisitioned" through an AFP only after

Developer's "reasons for withholding payment are removed" through a Change Order or the

conclusion of dispute resolution. *Id.*

42.     Consideration and finalization of each AFP needed to take place in sequence, as

prior progress informed the amount of work that was left to be done, for each line item in the

Schedule of Values, in subsequent periods.

### 3.     When the DBT's costs greatly exceeded the fixed price, it stopped complying with the payment process to manufacture an excuse to breach.

NY Wheel paid all properly submitted AFPs.

43.     In its AFPs, the DBT would frequently attempt to bill for more progress than it

had actually made.  In these cases, the DBT was not billing its progress based on its actual

percentage completion and the Schedule of Values, as required by the Agreement.  Instead, the

DBT was billing based on how much it was spending on fabricating components, which often

exceeded how much it could properly bill for.  For example, in March of 2016, the Schedule of

Values allocated approximately $2.8 million for the Wheel Hub and Spindle.  The DBT had

requested about $2.2 million in payment, which would reflect near 80% completion.  In reality,

the Hub fabrication had not even begun, and the DBT knew it would require at least another $4.8

million to complete it (far more than the $2.8 million Schedule of Values amount).  Instead of

billing for its percentage completion against the Schedule of Values, the DBT was billing for

what it had spent.

44.     For AFPs 1-12, however, the DBT ultimately followed the payment process.  The

DBT revised its AFPs in response to Developer's comments (e.g., regarding overbilling for

completion or other improper charges) and submitted certified, final AFPs.  In limited cases,

Developer told the DBT that, reserving Developer's rights, it was willing to pay limited overcharges, to facilitate the DBT's progress.

45.     In response to properly finalized AFPs, Developer issued Certificates of Payment for AFPs 1 through 12, and caused timely payment to issue to the DBT, totaling about $39 million.

46.     The following example illustrates how the process worked, for AFP 11.  On August 15, 2016, Ewout Sloots of the DBT emailed Developer the preliminary "pencil copy" of AFP 11, seeking $5,426,382.

47.     Developer explained to the DBT that a number of the line items could not be accepted as calculated in the pencil AFP because, among other reasons, they were not properly substantiated, included costs that exceeded the percentage of work completed, or were not clearly tied to items on the Schedule of Values.

48.     After multiple rounds of comments from Developer and the DBT the parties agreed on the final AFP.  And on September 12, 2016, the DBT emailed an updated AFP and requested a Certificate of Payment.  That same day, the DBT mailed developer an invoice, attaching a certified copy of AFP 11.  On September 14, 2016, Developer approved the payment.

49.     The chart on the next page shows the amounts originally sought by the DBT in its initial "pencil copy" AFPs, and the amounts certified and paid—after the DBT conceded to its overbilling.  Over the course of 12 AFPs, the DBT removed $14,635,018 million in overcharges. If the DBT legitimately believed that it was owed that money, it would have invoked the contractual arbitration process for disputed amounts under $15 million.  *See* DBA §19.2.  It never did.

14

| AFP | Pencil copy AFP | Certified and paid | Charges removed ($) | Charges removed (%) |
|---|---|---|---|---|
| 1 | $3,395,732 | $2,264,462 | $1,131,270 | 33.3% |
| 2 | $5,270,058 | $4,745,159 | $524,899 | 10.0% |
| 3 | $4,537,500 | $4,607,555 | None | None |
| 4 | $1,489,878 | $1,487,107 | $2,771 | 0.1% |
| 5 | $7,575,829 | $7,639,696 | None | None |
| 6 | $4,501,827 | $4,501,827 | None | None |
| 7 | $4,850,335 | $2,485,788 | $2,364,547 | 48.8% |
| 8 | $3,674,954 | $1,342,005 | $2,332,949 | 63.5% |
| 9 | $4,019,283 | $3,048,697 | $970,586 | 24.1% |
| 10 | $2,683,815 | $2,595,729 | $88,086 | 3.3% |
| 11 | $5,426,382 | $2,940,825 | $2,485,557 | 45.8% |
| 12 | $6,044,011 | $1,175,736 | $4,868,275 | 80.5% |
| **1 – 12** | **$53,469,604** | **$38,834,586** | **$14,635,018** | **27.4%** |

<u>The Design Build Team stopped complying with the payment process.</u>

50.     It was difficult for Developer to keep tabs on the DBT's progress and projected cost overruns, because, although the DBT would bill for whatever it had spent, the DBT was not transparent about how much more it would have to spend to complete a line item.  Despite repeated requests by Developer, the DBT failed to tell Developer how much it was actually going to have to spend to complete the items on the Schedule of Values.

51.     After AFP 12 was finalized on October 28, 2016, and paid in November 2016, the DBT abruptly stopped complying with the contractual payment process.

52.     The DBT continued to consistently overstate its percentage completion for various line items and failed to substantiate line items.  What changed was the DBT's response to Developer's comments on its "pencil copy" AFPs.  For each AFP, Developer gave the DBT detailed comments and fully satisfied its obligations to put the DBT on notice of the reasons why

the DBT's outstanding AFPs could not be accepted.  The DBT ignored Developer's concerns and refused to remove unjustified charges or submit accurate, certified AFPs.

53.     For example, in AFP 14, for line item 4d (Rim parts), the Schedule of Values listed a value of $13,971,399.  The DBT requested a progress payment of $918,353, which (including prior payments) brought the total charge to $10,159,433.  To justify this bill, progress would have to be 72.7% complete.  However, only 66% of the work had actually been completed.  The same was true for Item 7a (Capsules).  The DBT was trying to bill for 32.9% completion, but the work was only 26% complete.  This resulted in about $1 million in excess charges.  The DBT refused to remove these unjustified charges and never submitted a certified AFP.

54.     Similarly, AFP 15 contained numerous instances where the amounts requested exceeded the allowable payment based on the percentage of work actually completed.  For example, for line item 4d (Rim), site visits by Arup revealed that the rim was less than 50% complete.  But the corresponding line item on the AFP showed a requisition for $600,751, which would bring the total charged so far to $10,760,004.  This would have only been permissible if the rim were at least 77% finished (which it was not).  Again, the DBT refused to remove illegitimate charges and submit a properly certified AFP.

55.     In addition to trying to overbill for its completion of Wheel components, the DBT also repeatedly attempted to bill for unapproved change orders and disputed "delay damages."  The DBT would include these items in its AFPs in a box for "approved" change orders (which they were not).  For example, in AFPs 13 and 14, the DBT included "delay damages" as purported "approved" change orders.  As the DBT knew, no such change orders were approved.

56.     Similar scenarios occurred with respect to AFPs 16 through 23.  For AFPs 13-23, the DBT never submitted a certified AFP.

57.     The Agreement required Developer, within seven days after receipt of a final AFP, to either issue a Certificate for Payment for the amount of the AFP or notify "the Design Build Team in writing of Developer's reasons for withholding certification in whole or in part." DBA § 10.3.  After AFP 12, the Design Build Team never submitted a final, certified AFP as required by the contractual AIA Form G-702.  Developer therefore had no duty to issue a Certificate of Payment or to issue further reasons for withholding certification. [4]

The DBT's goal was to manufacture an excuse to breach.

58.     The DBT would not even submit a certified AFP when Developer did all the work for it and told the DBT expressly that it could submit an AFP without prejudice to seeking disputed amounts.  Bogging down the project in payment disputes was the opposite of Developer's goal.  Developer's goal was to get the DBT into compliance with the payment process and complete the Wheel.  To that end, on April 14, 2017, Developer sent the DBT a "Proposed Final AFP 13" that Developer itself assembled using the incomplete invoices provided by the DBT.  Under the Agreement, preparing AFPs was the DBT's responsibility. Preparing AFPs was the DBT's contractual responsibility because the DBT had complete information about its progress and costs, while Developer had incomplete information.  But, as best as Developer could determine from the incomplete information provided by the DBT, this

_____

[4] As explained in more detail below, Developer terminated the DBT for cause in July of 2017.  There was no outstanding payment obligation at that time because the DBT had never submitted proper, certified AFPs for AFPs 13-23.  Moreover, Developer's termination of the DBT for cause would have extinguished any such obligation.  DBA § 13.4.  Also, the DBT itself purported to withdraw from the Agreement on July 20, 2017.  Thus, Developer has no obligation to respond to, much less pay any amount claimed in AFP 23 (submitted on August 15, 2017).

Proposed AFP 13 reasonably approximated the DBT's progress.

59.     Developer offered to issue a Certificate of Payment for Proposed Final AFP 13 if the DBT would simply certify, sign, and return the document, as required by the Agreement. Developer was explicit that submitting the Proposed AFP would not prejudice the DBT's right to seek disputed amounts.  In a letter sent on April 14, 2017, Developer wrote:

> Developer further notes for the sake of good order that neither the DBT's acceptance of Proposed Final AFP 13 nor the DBT's submission of a complete, updated Schedule of Values as required by the DBA acts under the DBA as a waiver of any rights the DBT might have to later seek recovery of the excluded amounts in dispute.

60.     The DBT did not respond to this offer (much less submit a certified AFP 13).  The DBT was no longer interested in being paid based on the fixed-price contract—it wanted out.

61.     If the DBT's goal was to get paid and resolve disputes, it would have submitted properly certified AFPs and then invoked the contractual arbitration process for resolving remaining amounts in dispute.  If the DBT's goal was, on the other hand, to create disputes and try to get out of the Agreement, it would not want the disputes to be resolved.  The DBT never invoked the contractual process for resolving disputed payment amounts.

62.     Under the Design Build Agreement, if disputes valued at less than $15 million arose regarding "cost or any changes in the Work," e.g., the value of the Progress Payments owed to the DBT, the DBT was required to bring an arbitration pursuant to the rules of the American Arbitration Association, and above that cap, a litigation before this Court.  DBA § 19.2.1.  This contractual process allowed properly certified, undisputed amounts to be paid, via the AFP process, and provided an efficient dispute resolution mechanism for amounts that remained disputed.

63.     The DBT never invoked the dispute resolution procedures set forth in Article XIX to resolve any disputed amounts or other claims for Progress Payments.  Instead, the DBT continued to submit AFPs with disputed and unjustified charges, which Developer rightly would not pay.

64.     Given the circumstances, the DBT's submission of false, uncertified AFPs was a deliberate measure to obtain more money than the DBT was entitled to, or to generate refusals to pay that the DBT could point to as purported breaches of Developer's payment obligations.

**4.      Finally, to stop its losses, the DBT walked off the job.**

65.     On May 10, 2017, the DBT purported to "exercise its right to invoke an immediate suspension of work in accordance with Section 13.3(a) of the [Agreement]."  The DBT asserted that Developer defaulted by failing to issue Certificates of Payment.

66.     The DBT had no legitimate basis to suspend performance or withdraw from the Agreement under Section 13.3(a).  The DBT could only withdraw if (a) in response to a properly-submitted, certified AFP, Developer failed to issue a Certificate of Payment or provide valid reasons for withholding certification, or (b) Developer violated other material obligations (without cure in specified periods).  DBA § 13.3.

67.     None of these conditions applied.  Developer issued Certificates of Payment to the DBT with respect to all final, certified AFPs submitted by the DBT.  After AFP 12, the DBT intentionally failed to submit a final, certified AFP, despite Developer's efforts to bring the DBT into compliance with the contractual payment process.  Thus, under the contract, Developer had no duty to issue a Certificate of Payment after AFP 12.  Moreover, throughout the payment process, Developer provided the DBT with detailed reasons why it would not pay illegitimate charges.

68.     On May 26, 2017, the DBT sent a follow-up letter to "confirm" that the DBT was suspending performance.  The DBT again cited NY Wheel's alleged "failure to comply with its obligations to provide Certificate(s) for Payment."   That same day, the DBT lowered and tied off a crane boom on the site, signaling its intent to cease work.

69.     NY Wheel wanted the DBT to comply with the Agreement, so that it could be paid for the work it actually completed and keep working to complete the Wheel.  In another effort to make this happen, NY Wheel reviewed AFPs 14-20, removed illegitimate charges (e.g., attempted overcharges for percentage of completion), and sent the DBT the proposed final AFPs. (NY Wheel had already done this, earlier, for AFP 13)  This was very difficult for Developer, because it had incomplete information on the DBT's actual progress and costs.  On May 29, 2017, Developer wrote to the DBT offering to pay $7,227,705, for AFPs 13-20, if the DBT would simply submit the certified AFPs, as required by the Agreement.  Developer stated: "This offer is without prejudice to the DBT's right to seek the full agreed Contract Sum."  Again, the DBT refused.

70.     On May 30, 2017, Developer provided the DBT written notice of the DBT's breaches under the Agreement, reiterating previous notices of these breaches, and filed the original complaint in *New York Wheel Owner LLC v. Mammoet-Starneth LLC*, No. 17-CV-4026 (JMF) (S.D.N.Y).

71.     On July 11, 2017, Developer gave the DBT notice of its decision to terminate the DBT in light of the DBT's numerous material breaches of the Agreement.  The termination officially went into effect on July 21, 2017, at the end of the 10-day notice period.  DBA § 13.4.

72.     On July 20, 2017, the DBT purported to withdraw from the Agreement.  The DBT's primary basis for its withdrawal was its assertion that it was owed Certificates of

Payment.

73.     If what the DBT really wanted was to get paid, it would have accepted Developer's offers of payment without prejudice to its rights.  On June 5, 2017, at a hearing before this Court, the DBT admitted that it would "have no right to terminate" should Developer "write a check for" the undisputed amount that Developer had said it would pay, if the DBT had complied with the Agreement and submitted proper, certified paperwork. [5]

74.     On July 11, 2017, to eliminate any contention by the DBT that it was owed money, Developer wired $7,277,705.58 for AFPs 13 through 20 to the DBT.  This is the amount that would have been owed under these AFPs had the DBT submitted properly certified and final AFPs.  Developer stated: "This payment is made without prejudice as to any other rights that either party may have under the Design Build Agreement."

75.     On July 17, 2017 the DBT rejected the payment, falsely claiming that Developer conditioned the DBT's acceptance of the payment upon the DBT waiving its claims against Developer.  The DBT returned those funds to Developer by check.

76.     The DBT did not want to get paid and continue work.  It wanted to get out of the fixed-price Agreement.

**5.     The DBT's material breaches.**

77.      The Agreement allows NY Wheel to terminate the DBT for cause (after specified cure periods) if the DBT "abandon[s] the Work for more than seven (7) consecutive days" or "fail[s] . . . to promptly and diligently prosecute the Work," "submit[s] an Application for Payment …  which intentionally is falsified in any material respect" or "otherwise violates any

---

[5] There was some dispute about whether this amount was $7.7 million (DBT) or $7.2 million (Developer).  But the issue was not about this $500,000 difference.

material provision of the Design Build Documents."  DBA § 13.4.

78.    The DBT materially breached the Agreement, justifying its termination for cause. The DBT breached the Agreement in several ways, including the following.

79.    The DBT suspended performance, without justification, for more than seven consecutive days.

80.    The DBT intentionally submitted false AFPs and refused to remove illegitimate charges.

81.    The DBT failed to diligently prosecute the work.  The Agreement required the DBT to deliver "signed, stamped, sealed and fully coordinated engineering drawings required for obtaining the Building Permits" by July 1, 2015.  DBA § 6.3.  The DBT delivered these drawings nine months late, on April 29, 2016.  And even then, the DBT delivered a partial set of drawings only sufficient for the Building Department to start review (the DBT never submitted documentation sufficient to actually obtain a Building Permit).

82.    The Agreement further required the DBT to hit "substantial completion" by May 15, 2017.  DBA § 5.2.1.  The DBT failed to hit this date (or ever substantially complete the Wheel).

83.    The Agreement stated that "[n]o Key or Project Personnel in an executive or supervisory role shall be changed or removed without the written consent of the Developer." Terminations, reassignments and reduction in Project responsibilities "of any" Key Personnel are grounds for Developer to terminate the DBT "for cause" if not timely corrected to Developer's "reasonable satisfaction."  DBA § 3.6; DBA § 13.4.  The DBT breached the Agreement by terminating Project Director Jelmar de Vries and DBT Representatives Robbie Hellstrom and Peter Adegeest without notifying Developer or obtaining written consent.

84.     The Agreement required the DBT to provide Developer with access to its books and records, upon five business days' notice.  DBA § 3.4.1(b) and § 17.2.  Developer requested such access on May 15, 2017, and again on May 19, 2017.  The DBT refused to comply.

85.     The DBT also breached the Agreement by failing to complete work for the Wheel that was its responsibility under the Agreement.  In an effort to complete the project, Developer paid for this work to be completed (reserving its rights to later seek compensation).

86.     This work included:

- Construction of temporary and permanent embeds (i.e., plinths) for the Wheel (at least $8,000,000).

- Special inspections of Wheel components to obtain the Building Permit (at least $3,800,000).  *See* CAR 1, Appendix A ¶6.

- Construction of a temporary construction dock to deliver equipment and components necessary for construction (at least $1,000,000).  *See* DBA Ex. R (Developer was responsible for the foundation of the dock, while the DBT was responsible for the rest).

- Overtime and additional material costs for Wheel foundation, due to DBT delays (at least $600,000).

- Installation of lightning protection at the site (at least $430,000).

- Load spreaders and crane matting for crane work (at least $330,000).

- One-half of utility-running charges which the DBT agreed to pay and other DBT utility costs paid by NY Wheel (at least $100,000).  *See* CAR 1 Appendix A ¶1.

**B.     Mammoet USA Holding and Starneth BV breached the Completion Guaranty held by lender NY Regional Center.**

87.     NY Regional Center was a lender to developer New York Wheel, lending $206 million to the project.  To protect its loan, NY Regional Center obtained a Completion Guaranty (the "Guaranty") from Mammoet USA Holding, Inc. and Starneth B.V (the "Guarantors").  Ex. 1 ("Guaranty").  Under the Guaranty, if the DBT breached the Design Build Agreement, the Guarantors would be required to either complete the project or pay damages.  As described

above, the DBT breached the Design Build Agreement.  The Guarantors have breached the

Guaranty by refusing to complete the project or pay damages.

> 1.      **To protect its loan, NY Regional Center secured a Completion Guaranty from Mammoet USA Holding and Starneth BV.**

88.      For a construction-related loan, a lender can protect its loan by obtaining a

guaranty that the construction company will complete the project.  This is important because the

lender is only likely to get repaid if the project is completed and succeeds.

89.      On May 20, 2015, NY Regional Center obtained the Completion Guaranty from

Mammoet USA Holding and Starneth BV, guaranteeing the "full performance and completion"

of the Wheel.  Guaranty § 1.1 (a).

90.      Under the Guaranty, if the DBT defaults on the Design Build Agreement, NY

Regional Center can make a Performance Demand of the Guarantors.  In response to a

Performance Demand, the Guarantors must either (1) complete the project or (2) pay damages.

The Guarantors' obligations are joint and several.  *See* Guaranty Article I.

91.      The Guaranty further requires Mammoet USA Holding, Inc. to "at all times

maintain a Balance Sheet Value" of at least $115 million dollars.  Guaranty Article XVI.

Mammoet USA Holding, Inc. is required to deliver regular balance sheet statements to NY

Regional Center.  *Id.*

92.      The Guaranty was written to provide ironclad protection.  The passage of time

and changed circumstances (like the bankruptcy of the DBT), have no impact on enforceability.

For example, Article II states that the Guaranty is a "Guaranty Absolute."  This article states that

the Guaranty is enforceable despite (1) "bankruptcy" of the DBT, (2) any "delay" in making a

Performance Demand, (3) the "termination" of the Design Build Agreement, or (4) numerous

other changes in circumstances.  These circumstances are exactly the type of situations that the Completion Guaranty was intended to protect against.

> **2.**      **After the DBT breached the Agreement, the Guarantors refused to complete the Wheel or pay damages.**

93.      As described above, the DBT has defaulted on the Design Build Agreement and that default continues.

94.      NY Regional Center's loan has not been repaid and, under the Completion Guaranty, there are "Mezzanine Loan Obligations" outstanding.  Guaranty § 1.2 (a) (ii).  Under the Guaranty, NY Regional Center may make a Performance Demand with the "written consent" of the Agent for lenders senior to NY Regional Center.  *Id.*  NY Regional Center obtained that written consent from Agent on July 23, 2019.

95.      On July 30, 2019, NY Regional Center provided required notices and made a Performance Demand.  *See* Guaranty § 1.2 (5-day notice period).

96.      Any and all conditions precedent to the Guarantors' obligations to complete the Wheel or pay damages have occurred or have been performed.

97.      On August 7, 2019, the Guarantors responded by denying the enforceability of the Completion Guaranty. [6]

> **3.**      **NY Regional Center is entitled to damages under the Guaranty.**

98.      To address the substantial harm that would result if the Guarantors refuse to complete the project, the Completion Guaranty provides a measure of damages.  This measure relates to the estimated cost of paying an alternative builder to complete the Wheel.  Guaranty § 1.2 (c).

---

[6] The Guaranty also requires that Mammoet USA Holding provide regular audited balance sheets.  Mammoet USA Holding has failed to do this.

99.     The Completion Guaranty further provides for Enforcement Costs (reasonable out-of-pocket costs spent enforcing the Completion Guaranty) and Lien Discharge costs (the cost of bonding or removing liens on the property related to the work by the DBT).  Guaranty § 1.2 (c).

100.     Under the Completion Guaranty, NY Regional Center is entitled to contractual damages, including Enforcement Costs and any applicable Lien Discharge costs.

## Claims

### Count 1: Breach of contract
### (Against Mammoet USA Holding)

101.     Plaintiff incorporates by reference the allegations in the paragraphs above.

102.     The Completion Guaranty is a valid contract between plaintiff NY Regional Center and Mammoet USA Holding and Starneth BV (the "Guarantors").

103.     NY Regional Center performed all of its obligations under the Completion Guaranty or was excused from performance.

104.     The DBT breached the Design Build Agreement.  See paragraphs 19 – 86.

105.     The Guarantors breached the Completion Guaranty by refusing to complete the Wheel or pay damages.

106.     NY Regional Center is entitled to damages under the Completion Guaranty, including Enforcement Costs and any applicable Lien Discharge costs.

## Requested Relief

Plaintiff respectfully requests that this Court enter a judgment in Plaintiff's favor and against Defendant, consisting of:

a.  Money damages, with interest, to compensate NY Regional Center for Defendant's breach;

b. Attorneys' fees and other litigation costs, as Enforcement Costs under the Completion Guaranty;

c. Plaintiff's costs; and

d. All additional relief that the Court deems proper.

Date:  November 11, 2020                    Respectfully submitted,

/s/ *Hunter Brooks Mims*
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
Hunter B. Mims
7 Times Square
New York, NY 10036-6516
(212) 833-1100
hmims@fklaw.com

John Jeffrey Eichmann
(*pro hac vice* forthcoming)
Jonas Jacobson
(*pro hac vice* forthcoming*)*
Greg Dovel
(*pro hac vice* forthcoming)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
jeff@dovel.com
jonas@dovel.com
greg@dovel.com

Counsel for Plaintiff NY Regional

27